Thank you, Your Honor. Daniel Selmy and Deborah Keith with me at Council Table for the Petitioner South Coast Air Quality Management District. If I could, I'd like to reserve five minutes of time for rebuttal. Sure. Thank you, Your Honor. There's simply no question that the approval of the North Baja Pipeline and what it represents is a critical decision for California's energy future. My client, the District, has been the single biggest promoter of the use of natural gas in Southern California. I asked them the other day and they tallied it. We have administered $200 million of grants over the last 20 years intended to foster the use of natural gas. Is this in the record? No, it's not, Your Honor. I just want to make it clear that my client Why are you telling us something that's not in the record? Fine, Your Honor. I'll go on then. My point is that liquid natural gas is an entirely different matter. It has different qualities. The impacts of burning that gas are far different than traditional gas. Those impacts will occur in the South Coast Basin and there are mitigation measures available. Our position is that reasoned decision making requires an analysis of both those impacts and of the mitigation measures available to stop them before any long-term decision like this is made. Do we know from this record where this burning will take place? What we know, Your Honor, is that the pipeline will connect at Blythe to the Southern California gas system and that gas system serves the entire Southern California area, including the South Coast Air Basin. My question was, do we know where this burning will take place? And the gas, do we know the specific sources that will burn it? No. We know that that gas ultimately will be distributed to the variety of sources in the basin, Your Honor. So the burning could take place in Imperial County or Riverside County? Your Honor, the record does indicate, the EIS indicates, that substantial quantities of the gas will come to the South Coast Air Basin. And in fact, Shell, the proponent of the pipeline, said that substantial portions will come to the South Coast Air Basin. There's a map in the record that points in the direction of the South Coast Air Basin. I don't think it can be disputed that a large quantity of this gas will be burned in Southern California. In order to distribute it, must it be burned? To distribute it, must it be burned? Yes. No, Your Honor, I don't believe so. The gas is ultimately, when it goes to the Southern California gas distribution system, and then it gets distributed to very large sources, such as power plants, and to a lot of very small sources that burn it, relatively small burners. And the variety of those in the South Coast District is simply very large. Okay. Go ahead. There are four salient facts. One is that the Wobbe index of the gas that's going to come in is going to be very high. The evidence in the record indicates it could be as high as 1424, 1428 if it comes from Australia or Malaysia. The traditional average in the South Coast Basin is 1332. Second, we believe, as I just said to you, that the gas is going to come to the basin. And third, when it's burned, it is a scientific fact that it will produce increased NOx emissions. The district's chief scientist went through what happens in the record when that gas is burned. You get a different air-to-fuel mixture, and you get increased emissions. He also said, pointed out, that the smaller sources, which are not continually monitored, the emissions, the increase in emissions, will be undetected. And that's really what this case is about. The question is, do we deal with this prospectively, or do we deal with it on an after-the-fact basis, after the gas is burned, when we have the increase in emissions, when we have sources who will be out of compliance, when we either have to deal with those sources as being in violation, or we have to seek other sources to mitigate it. And that's why we believe, and we have insisted from day one, that while we're not opposed to natural gas, this gas has to be treated differently. And it's also, I believe, conclusive from the record that there are mitigation measures available. Shell itself testified in the record that the injection of nitrogen into the gas is, quote, an effective way to lower the Wellby Index. There are other methods available in the record, the Energy Commission studies in the record. The industry's own white paper identifies various methods that can be used. None of those were analyzed in this case. And the consequences will, ineluctably, be an increase in emissions. That's why the Environmental Protection Agency insisted that the EIS was inadequate. Both this Court's opinion in Sonoran and its most recent opinion in White Tanks emphasized that when EPA finds that an EIS is inadequate, that is some indication to the Court that something extraordinary is going on here. And EPA's position was quite clear. The impact should be analyzed, the mitigation measures should be analyzed, and there should be a conformity analysis done under the Clean Air Act. None of this was done. Now, the Commission takes the position that it satisfied EPA. But chronologically, that can't be true. First of all, there's nothing in the record that says they satisfied EPA's concerns. And chronologically, it simply can't be true, because what happened here was the final EIS came out, it had FERC's recommended position, which is what it ultimately adopted. After that, EPA wrote its final letter saying it still found the document inadequate. The tests under NEPA, Your Honor, are relatively straightforward. For indirect emissions, is it reasonably foreseeable? And I was thinking about reasonable foreseeability. It's a tort term. This is, it's intentional. I mean, it rises to the level of substantial certainty that this gas is going to be burned and you're going to get the emissions here. The principal argument raised now is that there's no causation, citing the Supreme Court's public citizen's case. But as this Court just said in White Tanks this past year, public citizen was premised on the fact that the President had decided to allow trucks into the United States, and the discretion available to the Department of Transportation thereafter was not, was not at a level that could stop that. FERC has broad discretion under the natural gas here to deal with the problem if it would exercise it. They're arguing that the fact, they make two arguments, if I understand that. They say that the analog of the President in the public utility case is the California Public Utilities Commission, which certainly can, has the authority to set these WOBE, is that it? Correct, Your Honor. WOBE standards. And they also say that the Department of Energy has that authority as well. So they're saying, well, look, we're allowing the construction of this facility, or the reconfiguration of it, if that's a more accurate word. And there are other agencies that, it's not us, it's the decision of California Public Utilities Commission to allow a WOBE of 1385, and presumably the Department of Energy, if it wished to, could also set the standards. So why aren't they the equivalent of the analog of the President in the public utilities case? For a number of reasons, Your Honor. And I want to go through all of them if I can, because the role of the CPC is critical here. First of all, the reason that the President is not the analog here is that there is no question that over the pipeline itself and the conditions under which the pipeline may be allowed to serve, that FERC has broad discretion over that. It's been delegated discretion over the initial entry by the Department of Energy. And certainly, once the pipeline distributes the gas, the California Public Utilities Commission has jurisdiction. But there is no question over that pipeline itself that FERC has jurisdiction over the gas quality in the pipeline. In fact, in this very case, one of the conditions it put on the pipeline was a gas quality condition. So to suggest they have no discretion simply isn't accurate. That's my first point. My second point is that they simply can't rely on the Public Utilities Commission to have done the environmental analysis. The question is whether they're the cause. In other words, the argument, as I understand it, is that the cause is really, do you agree that the Department of Energy also has the authority here to regulate? Over the initial entry, yes, Your Honor. And to regulate the WOBE levels? To say you need to have a WOBE level of 1365, let's say? I believe that's true, Your Honor. Although, if it's an issue, we would certainly want to look into it. It's never been an issue in the case so far, what the Department of Energy can do. Well, it's argued somewhere, either in the brief or in the ---- I'm willing to accept that point. And didn't you say at one point, I think, when you were arguing for a stay of the California public utilities, that this is really uncertain what effect this would have, and you just wanted to preserve the status quo for further studies? Your Honor, there's no question that there's a level of uncertainty associated with it, but that's precisely why we would submit that NEPA requires that the information be gathered. And certainly, while there's some uncertainty, there's a lot of evidence we have in the record Well, what didn't they say about this in their report? I mean, they seem to, you even quote from their acknowledgements about what would happen if this, if this were to happen, if this liquefied natural gas came in, what would you have them say? Here's what I would have them do, Your Honor. I would have them If you were writing this NEPA report the way you say they should have done, I mean, after all, NEPA doesn't require them to take any mitigating action. It simply acknowledges, it simply imposes on them to identify problems that are associated with the action that they're about to take. Maybe there are other statutes that might impose other obligations on them, but NEPA doesn't impose any obligation on them to do anything other than to identify impact. That's correct, Your Honor. And here's what I would have them do. First, I would have them gather all the information in the record as to what amounts of gas are likely to come to Southern California. And there is evidence in the record on that. There are the contracts that have been signed for the pipeline, and the amounts are in the record. There's testimony by North Baja on its application, how much gas will come in. Secondly, I'd have them analyze the information that's available, and there is information But just to stop, this is complicated, and I'm asking for help. So there is a limit to what can come in. In other words, it has to, it cannot exceed, the Wobbe index cannot exceed 1385. That's correct. So we know that. So what more, and we can assume that if the Wobbe index can't exceed 1385, and that natural gas that comes from a foreign source has a higher Wobbe index than from domestic sources, we can assume, it's quite obvious that gas is going to come in, liquefied natural gas is going to come in, that will meet, that will be as high as 1385. I can't believe I'm even saying this, to bring it down to 1385. So, so, what should they have said? The next point would be that they should then analyze what the impacts are, because yes, while the gas will be at 1385, the sources in the basin are used to burning gas that has an average of 1332. They've never seen anything like this before. And that's going to produce impacts. But even you took the position that it could be as high as 1360, didn't you? If I understand your position in the California proceeding. We took the position that we thought with some, and there was big debate over this, we could live with 1360. 1385 is higher, and there's going to be impacts. And of course, that wasn't the number adopted anyway. The difference is between 1332 and 1385. And, Your Honor, there is no analysis in this record whatsoever of what those impacts will be and how they will affect the South Coast Air Basin, the most polluted air basin in the country. In fact, the one figure you yourself say you don't know, and you claim all, I mean, if they accurately characterized your position before the, on a motion for the stay of the California utilities, whatever their full name is, that you said, we can't we don't know. We need further study. Leave the current system in place. Your Honor, we certainly weren't saying, when we were saying that it was unknown, that it was impossible to forecast. I mean, that's what NEEF is about. Reasonable forecasts about what will occur. I mean, it's the same thing. It's the same thing. It's the same argument that was made in the City of Davis case, where the interchange case, where the Department of Transportation says, we can't forecast what's going to go on outside the interchange, and this Court said, no, a reasonable forecast is necessary. And as I've tried to show the Court, there's evidence from which that kind of forecast can be made. There is an estimate, by the way, one estimate produced by Schell, that the increase will be between 0.6 tons and 1.2 tons per day in the South Coast air basin. The 1.2 tons per day would be the seventh largest source of nitrogen oxide in the South Coast air basin. That's a considerable amount of pollution. That's just one estimate that isn't in the record, Your Honor. You're almost down to your five minutes. I believe I am. I'll reserve the rest of my time. Thank you. Thank you for your argument. Okay. Now, counsel, on the other side, you agreed to a division of time. Yes, Your Honor. I'll be taking the first 12 minutes, and then counsel for Intervenor North Baja Pipeline will be taking the next four minutes. After that, counsel for the California Public Utilities Commission will take the final four minutes. Okay. And we will all do our best. Let's put 12 minutes on the clock, please. Thank you very much for that. Okay. Holly Caper for the Federal Energy Regulatory Commission, thank you for hearing from us today. I guess I'd like to start off with references to the record again because there's been a lot of discussion about what we do know and what we don't know. And to start, we don't know, in fact, where the gas that will be transported by North Baja's pipeline will be burned. We know that it will be burned in the southwest because that's the purpose of the project, to transport gas to the southwest. And there's evidence in the record that the Commission pointed to, in particular in the certificate order at pages 30 to 31, and note 75, also in FERC's excerpts of records at page 4 and page 12 to 13, that demonstrate that the gas is not intended solely to go strictly to the basin, that it will indeed be consumed throughout the southwest, and we don't know. Of course, some of the gas is likely to make it to the basin. We don't know how much. We also do know, by contrast, that any gas that does make it from the North Baja pipeline through SoCal Gas's system into the basin, with that long stretch of distance there, will have a Wobbe index value of between 1279 and 1385 because the CPUC has said it has to, and now because the Federal Energy Regulatory Commission has adopted the CPUC's requirement as well and imposed that upon the interstate portion of the North Baja pipeline. We also know that gas with a Wobbe index of up to 1437, I believe is the highest number I've seen, has been burned in Southern California and is continuing to, well, yeah, has been burned in Southern California before the California Commission imposed its standards. And that we can see in the CPUC's decision, the amended record six, part A, pages 157 to 160. So it's not the case that this gas has never been seen before, I think, as Petitioner's Counsel asserted. In fact, it has been seen before in the basin. Isn't their argument something like this? It's true that there have been higher amounts that have come in, 1427, which you just said, but that if you have this liquefied natural gas coming in in significant amounts with this higher Wobbe index, it's necessarily going to throw off more of these, let me just use the shorthand, contaminants. I think that is an accurate characterization of their argument. They have, in fact, conceded in other instances and in their briefs that this type of gas has been seen before in Southern California. I know it's been seen before. I'm trying to get to what I understand to be their argument. It's been seen before in the sense that some quantities of liquefied natural gas have come in at Wobbe levels higher than 1385, let's say, 1427. But that most of this, most of the liquefied natural gas that comes in is not at 1437. It's much lower, and their five-year average is below even 1360. I think what they're arguing, if you can answer it fine, if not, is that you're bringing in so much more at a higher Wobbe index that it's necessarily going to operate to increase the contaminants in the air. I mean, is that true? That is their argument, and what the commission found on that point in particular is that they haven't provided a basis for, and that, in fact, they're speculating when they conclude that the air quality in the basin will be worse as a result of burning of this gas or subsequent to the approval of this project, and that's at the rehearing order, page 18. Well, let's assume that 95 percent of the LNG was actually consumed in the basin. Would that change FERC's analysis? I don't believe that would change FERC's analysis. Let's say 100 percent. Right, and that gets to the public citizen line of argument, if you will, and that is magic. No, but it would change your response in terms of the speculation, because, you know, FERC could have done a probabilistic analysis of where the gas was likely to be burned, right? I think what the commission found is that it did not have enough information in the record in order to do that. There are so many unknowns here. They said there was not enough information in the record in order to undertake the analysis, but, you know, people predict where natural gas or LNG goes all the time. You can't do it with any precision, but, you know, that's part of rate making and so forth, right? Well, and then the point becomes what's the purpose of doing that, because what is the commission going to do with that information? The commission reviewed its own jurisdiction under the Natural Gas Act and said, no matter what we do in this case, gas with a Wobbe index up to 1385 is going to continue to be burned in Southern California and in the basin, because we simply do not have the authority to impose further restrictions upon the consumption of gas and the gas quality standards of that gas that's consumed in the basin. But I do think the Petitioners have a point in saying that FERC can mandate mitigation measures. There are a number of aspects of FERC's jurisdiction that could come into play here. Don't you agree with that? The commission certainly does have broad jurisdiction to impose mitigation measures under the Natural Gas Act. However, it does not have and it would not be consistent with this Court's precedent under NEPA or the Natural Gas Act for the commission to essentially use its Natural Gas Act authority to mitigate effects of consumption. There are three things at play here. There's the importation, the transportation, and the consumption. The commission is stuck in the middle. It controls and regulates the transportation. The CPUC regulates the consumption. The Department of Energy, as was discussed, controls the decision on importation in general. So for the commission to use its authority over transportation over the interstate pipeline to affect an intrastate matter would be leveraging its authority beyond what's required or allowed by the Natural Gas Act, and in particular under FPC v. Louisiana. I don't understand. They did say that whatever liquefied natural gas comes in and is transported on this pipeline has to meet the highest standard of any community that the gas passes through, and therefore that's where you get into the California Public Utilities Standard. In effect, haven't they told them that this liquefied natural gas has to meet the California Public Utilities Commission standard? The commission did do that. So doesn't that show that they have? They could have said by a variation of 2 percent instead of 4 percent. Are you saying they really didn't have the power to do that or that it would be an improvident exercise of that power to interfere with what the California Public Utilities Commission did? The commission found that it really does not have the authority to do that. It did require an interstate pipeline, which North Baja is, and that is what it did, as you recognized in this case. But requiring something more when there is no allegation in this record that it is required for the operation or safety or environmental effects of the North Baja interstate pipeline would be going beyond the commission's authority under the Natural Gas Act. So which argument is it? Well, let's take a hypothetical example of a totally irresponsible state where EPA comes and says, look, if you allow this to happen, there's going to be serious pollution. When you get right down to it, the first position is it doesn't matter, right? We have no power, no jurisdiction, even if we know that bad environmental effects will occur. I don't know that that's what the commission is saying, because here we don't know that bad environmental effects will occur. I know, but isn't that your jurisdictional argument? I mean, that's the point of jurisdiction. If you say we don't have jurisdiction to look at that, aren't you really saying it doesn't matter how bad it is, it doesn't matter how good it is, we're not going to get into it? Isn't that first position? Or am I wrong on that? You know, I suppose you're right, because I believe that is the holding of public citizens. So, yes, I think that's correct. You know, in that case, the motor carriers were going to come over the border, regardless of the Federal Motor Carrier Safety Administration's authority, and it's the same situation here where the CPUC is the analog of the vehicle that was brought up to 1385 to be burned in Southern California, regardless of what the commission does and regardless of what the commission might find there. So here's my follow-up question to that. If that's the case, and I know these are hypothetical, there are a lot of other moving parts to this thing, but if we then take the holding and the guidance of some of our cases, which say, look, you can't use a jurisdictional deficiency, if you will, to leave a gap, that somebody has to take a look at it in terms of NEPA, somebody with authority, where does that leave us in this case? Because we have a situation where potentially no one is going to take a hard look as required under NEPA, hypothetically. Right. Well, I think first we need to look to FPC versus Louisiana, the Supreme Court case construing the Natural Gas Act in particular, where, and that's the same at play here, where the court said that the commission cannot exert authority simply because there is a regulatory gap. So I think we need to start with that. And then I think we would look to the fact that the California commission did in fact conduct, you know, some environmental review, albeit not the CEQA review, but that's because the state courts found that, as affirming the California commission, of course, that it simply wasn't required. So there's not the case here that NEPA is somehow being evaded or avoided at all. It's simply the case that there's, NEPA is not triggered. No, no, you're saying basically there's no one who has the authority or the duty to apply NEPA here. If I understand your argument to carry to its extreme. Certainly that would be an extreme view of the argument. Who does the NEPA analysis here but FERC? I think that there is no trigger for NEPA here. So I think that's the disconnect, is that because there's no trigger for NEPA, then there's not a need for a NEPA review, and then there's no evasion. Well, isn't, don't I understand, wasn't there, there's a California State Lands Commission, which had to give some approval here. And wasn't there a, wasn't this a joint environmental impact statement of both the California State Lands Commission and FERC? Yes, that's true, Your Honor. The California State Lands Commission was the lead agency for purposes of the California Environmental Quality Act review of the North Baja project. And so this project, you could say, was also reviewed under CEQA. And again, I suppose I should emphasize that that was the North Baja interstate pipeline that was reviewed under both CEQA and NEPA. So in this case, hypothetically, if Arizona had intervened and said, you know, we like this natural gas, and we've studied this issue, and we don't believe those Wobbly Index, Wobbly Index is 16.5, would FERC say anything? If I understand you correctly, Arizona would be imposing a 16.5 maximum Wobbly Index on its distributors and the gas that's consumed within Arizona? Yes. Well, I think the case there would be they would be asking, or North Baja, as it proposed for California standards, would be proposing only to transport gas of a 16.5 maximum Wobbly Index. But I do have to mention that, of course, when you start lowering the Wobbly Index like that, and I don't have exact figures for you, then you eliminate the feasibility of the project, if I can put it that way. Okay. All right. Thank you very much. Please, go ahead. Judge Corman has one more question for you. I have one more question. And the commission, in denying rehearing, says that notwithstanding this fact that they felt that they don't have to discuss the issue, we find, as discussed below, that the consumption of regasified LNG transported by North Baja and meeting CPU's WI standard of 1385 or less, by definition, should not result in a material increase in air pollutant emissions, and therefore should not result in material changes in air pollutant quality. Is that sufficient? I mean, in effect, they're saying even if we were wrong, we make a finding that it should not result in a material increase in air pollutant emissions. This is on page 28 of the petition denying. Right. I'm familiar with it. I believe that is sufficient, Your Honor, because what the commission did is it reviewed the California commission's proceeding, which led to the imposition of the 1385 standard, and found that to be adequate. And there's certainly precedent to support that one agency may rely upon another agency, Federal or State, in reaching its NEPA conclusions. And suppose an agency, and this is my last question, and maybe it should go to your adversary, but suppose an agency takes there, it's actually making a finding, saying it's not going to have any material change in air quality. Suppose it's wrong. Does that affect the legality of the NEPA statement or its compliance with the reg? Now, suppose it takes it into account, which essentially on the motion for hearing, it says it's not going to have any material change. And it turns out that that material change in air quality is not going to have any adverse impact on the environment. If they say it does, and they could prove that the commission was wrong, does that in any way affect the validity of the NEPA statement? Well, I think that in that case you have an agency that puts out an environmental impact statement that says it's not going to have any adverse impact on the environment. It turns out that they're wrong. But the other side says, well, they're wrong. It will have an adverse impact. Does that, even if they're right, would that affect the validity of the environmental impact statement? The environmental impact statement, I believe there's precedent discussing how it looks at essentially a snapshot in time. And, of course, circumstances can change. In any case, technology can change. No, I guess what I'm getting to is they have to, in order to satisfy me, but they have to make, they have to take certain factors into account. And they're saying, well, we've taken it into account. It's not going to have an adverse consequence. Does that satisfy NEPA? Or could somebody come in and say, we disagree with your analysis of whether it's going to have an adverse impact? Certainly parties always agree. And if there is later, I think as we've all acknowledged that the information on this subject is lacking and is still under development and there are going to be further studies. So if additional information does come forward, I would expect the NEPA to come forward. I'm sorry. They're claiming that the environmental impact statement is fundamentally defective because it didn't consider the potential adverse impact. Is this enough? Is that enough, even if they say, we did consider it and it's not going to have any material change? Does that comply with NEPA, even if it turns out that they could say they're wrong? Yes, I believe it does comply with NEPA, because the commission made its finding. It did so on the basis of substantial evidence. And NEPA only requires, as has been discussed, the commission to take a hard look and to take into consideration the environmental effects of an adverse impact. I can't speak to what that would do to the commission, whether the commission's decision would have been different, but I think that is enough, yes. Okay. All right. Next up, Mr. Morris, is that right? Okay. And four minutes, give or take. Up to you, Your Honor. Yes, I'm Harvey Morris. I represent the California Public Utilities Commission. We've intervened in this case in favor of the respondent, FDRC. We don't think there's a dispute that our agency under Section 1B and 1C of the Natural Gas Act has jurisdiction over the interstate pipelines and local distribution of natural gas that goes to the zone. That's an interesting case. We've got various elements of the State of California fighting each other. No, Your Honor. I understand the California State Lands Commission supported the environmental impact statement with FERC. It's the South Coast Air Quality Management District that is challenging us. That's a governmental entity. Right. And it challenged us to the California Supreme Court where it lost, which constitutes a denial on the merits and raised judicata for all the claims they raised against us factually and legally. And we've asked this Court to take judicial notice of the briefs that were in front of the California Supreme Court because they make clear that the same arguments they're making to this Court, the same arguments they made to the California Supreme Court, that we do not have the substantial evidence in the record to support our findings. And having denied that petition for review, even one sentence, this Court held in the communication telesystems case, that's raised judicata as to the merits as far as the parties to the case are concerned. Now, they even tried to distinguish that with the consumer lobbies case where it's not starting to cite a precedent as to non-parties. But that very case itself, consumer lobbies, said as to the parties of the case, it's raised judicata and a decision on the merits for the facts and legal arguments. And what issue do you claim they've precluded from raising? Did you actually consider the impact of the importation of natural gas through the North Baja facility that would contain significant or that would contain significantly higher... Yes, Your Honor. ...well-being index that would come in at, let's say, all of it comes in at 1385, which is the top? Yes, Your Honor. We had, first of all, a two-day workshop on February 17th and 18th, 2005, which we held with three other State agencies. We then directed we did a workshop report which was circulated for comments. We then directed our California utilities to submit prepared written testimony addressing seven questions, two of which dealt with air impacts. And we invited all other parties, including South Coast to submit testimony in response. In December 2005, we had four days of evidentiary hearings reviewing all that evidence. And then we issued a proposed decision, and then finally had comments in that. Finally, our commission's decision, which is reported in the record, in the records, is Volume 6a, tab a. I think we recognize that, but how can a decision by the California Supreme Court preclude a party from challenging a violation of the Natural Gas Act, for example? The California Supreme Court's decision raised... I mean, just because they dealt with similar subject matter... The factual claims. May. But, I mean, you still have, and we have to take that into consideration under the FERC Act reasonably, but you're arguing issue and claim preclusion here. How can, was the Natural Gas Act claim made before the California Supreme Court? No, they made the argument in the context of CEQA. Right. But in CEQA claim, they also said there was no substantial evidence in the record to support our findings that there would be a negligible impact on air quality. And we therefore referred, and we asked this Court to take judicial notice of the pleadings where in their brief they had argued why we didn't have substantial evidence supporting us. We put our briefs in showing where we did have evidence supporting... Are they entitled to put in new evidence in challenging a FERC, making a NEPA challenge to a FERC? I believe that, Your Honor, that they didn't put in new evidence... Is a party entitled to put in new evidence in a Federal administrative proceeding that it didn't put in in a State proceeding? Yes, Your Honor. So why could this be raised judicata on anything? Because it barred the claims that they were making in front of us, which is what they repeated to FERC. That's why we tried to put their briefs in the Court's record. We also would like to point out one other thing, and this is very critical to California. As we're trying to make sure we have enough natural gas supplies, like their counsel stated, to take care of coal and oil-based fossil fuels, which are much dirtier, causing more nitrous oxide emissions and greenhouse gas emissions. If we don't have enough natural gas supplies in our future, then we're going to have even worse NOx emissions and we will have worse greenhouse gas emissions. And we put that in our briefs, and FERC put it in their briefs for hearing or even referred to the fact that you'll otherwise have to rely on greater fuel oil and coal for generation of electricity and for natural gas and for the fuel vehicles. And those concerns were never addressed by the South Coast Air Quality Management District. Does the Commission monitor compliance with its WOBI index standards? We have instructed the utilities to have a point monitoring, and it will be reported on their website what those, whether the WOBI index, what the WOBI index will be. And my understanding is no, there's been no burning yet. Is that correct? There's been no LNG gas coming in yet, and that's right. They're right now applying for a certificate. A yes would do just fine. But we do know that Rocky Mountain gas, which is coming into California at increasing levels, has a WOBI index that has averaged 1360. It's gone as high as 1379, and we have seen that that, and that one is increasing the WOBI index for all Southern California empirically. But here's my question. With regard to this particular gas that's at issue here, if it burns higher than 1385, is the Commission going to be able to determine  Is the Commission empowered to take steps to stop it? Yes, Your Honor, because we have said you violate our order, and we said that's the maximum limit that we'll allow into our State. So the answer is yes? Yes. Okay. You're two and a half minutes over your time. Thank you for coming in today. We'll hear now from North Baja. Ms. Stetson? Good morning, Your Honors. Kate Stetson for the North Baja intervenors. I want to speak to a few of the questions you all have asked this morning, because I think several of them point up a consistent theme and a consistent deficiency in the petitioner's argument. It comes under several different labels, but it has to do either with the unknowable information about this gas and the limits of FERC's authority to impose certain regulations on downstream consumption. So just to start, Judge Thomas, with your question, your broad question about FERC's duty to perform a NEPA analysis here, just to be clear, FERC performed a thorough and substantial NEPA analysis of the effects of the project that was proposed to it, which was the pipeline flow reversal. What it concluded it didn't have to do was to try to calculate the end-use consumption emission effects in the basin of the connection. And this goes, Judge Hawkins, to your very first question, do we know where this gas will be burned? The answer is no. And not only do we not know where the gas will be burned, we don't know at what WOBI index it will burn. And that's an absolutely critical point to explain FERC's inability to perform the kind of environmental analysis 100 or 200 miles away of the end-use, downstream consumption use of this gas. Well, you know, William Sutton used to say that he went to, he brought banks because that's where the money was. I mean, we know where the population is, right? Herrenberg, Arizona, if you went past it and blinked your eyes, you'd miss it, I can promise you. The population basis is right in the heart of this district, isn't it? Isn't that likely where this gas is going to go? I would say it's likely that some of the gas ends up there, but that's not even the only unknown here, Your Honor. It's not just where this gas is burned. This gas could be burned in Arizona, this gas could be burned in other parts of California. The other question is, again, at what WOBI index the gas will be burned. Everyone is focused on 1385. And by the way, the answer, Judge Corman, to your question about why that number, is that that is the high end of a plus or minus 4 percent of the historical average WOBI index of this gas. Over the last five years, the historical average has been 1332. That's exactly why the CPUC pegged that 4 percent band, and it's why the CPUC's counsel, as he just explained to you, the petitioners contested not the methodology, but that range. They wanted the 2 percent band. That was the focus of the proceeding and the focus of their subsequent appeal. But just to get back to the 1385 and the downstream use, when this gas comes into Ehrenberg, it's mixed with other gas of other WOBI indices. You can't tell by the time it gets to those population centers, Judge Hawkins, what that WOBI index of the gas will be. Now, but you can tell with some likelihood of what's going to happen. I mean, we've said before in FERC proceedings that just because something is complicated for FERC to do doesn't necessarily mean that FERC shouldn't be doing it. And probabilistically, you can make a rough estimate, I would think. And I'm not just saying that from the bench. But you look, there's this likelihood it's going to end up in the basin. And the question in this case is, did FERC have to take a look at it? That's not what the result of the ultimate inquiry was, is did FERC have to take a look at that? Sure. And I think, though, Your Honor, there's a difference between complicated and speculative. And what FERC has concluded here, because of all of the unknown inputs, is that it would be completely speculative. It falls outside of reasonable foreseeability. It falls on the far end of the causation chain. To be able for FERC to put together some metric to calculate all of the different inputs that would lead it to any kind of a reliable prediction about the downstream end-use consumption of this gas. It's one thing to say, as you heard Petitioner's Counsel say, we know how much gas is coming in. Well, sure, we can hypothesize what gas comes into Ehrenberg, or at least how much potentially can come in. But we don't know what happens after that. That's the problem. And as this Court consistently has said, there's a point where NEPA, where courts decline to apply NEPA. And that's when you start venturing into the realm of speculation. The agency had no, was not required to, and really had no capability to perform some kind of a hypothetical EIS. That's what the Petitioners are asking for here. Has your client signed contracts with potential users? Our client signs contracts with marketers, not with users. And that's one of the problems here, Your Honor. The way that this gas proceeds after it goes to that Ehrenberg connection in Arizona, it is joined up with gas over which, of course, North Baja has no control. We don't know the Wolbe index of that gas. We don't know how it's mixed. We don't know where it comes in. This is what's called an integrated pipeline system. And it takes its gas from many different locations, including the Rocky Mountains, including elsewhere in California. But it is measured every day, true? It is. The gas flow is measured every day. But I think what FERC was being asked here was to speculate on what would happen, you know, in Los Angeles, 200 miles away, when end users of LNG, or end users of NEPA, end users of NEPA, end users of NEPA, end users of NEPA, end users of NEPA, end users of NEPA, end users of NEPA, end users of NEPA, end users of NEPA, end users of NEPA. But the LNG system, of the natural gas that reached them, burned it. But before that happens, the LNG, as Judge Corman observed, comes into the system at most a 1385 Wolbe index in Ehrenberg. What we don't know is what happens and where the rest of the gas comes between Ehrenberg and Los Angeles. My only point is, because gas companies have to keep very, very meticulous records of the gas they put in the system, in fact, although it's complicated, in fact, you could look over time and find out on a probabilistic basis what the average could be in a particular day or month, depending on whether it has some impact and so forth. But because of pricing and everything else, they do have to  And so I have two responses, Your Honor. The first is that the CPUC, of course, committed at the end of its proceeding, where it found that setting the gas in this range, the plus or minus 4 percent band around the historical average, wouldn't have any adverse environmental impacts, to continue to study the issue. And there is, of course, a state remedy for anyone to come into the commission, the CPUC, and to petition for downstream emissions impacts of this gas that is being burned with this new introduction into the system are materially adverse. Did the, for the reasons that you gave just in your argument, for not discussing the impact, or did they just say, we don't have to discuss it because there's no causation and there's no this and there's no that? I mean, it seems to me that your argument is a much more subtle one. And did they actually make your argument in explaining why they did not want to address this issue? They did, indeed. If you look at paragraph 80 of the FERC order. Which one? Of the original order. And if you look at paragraph 45 of the rehearing order, it speaks to the issues that I've been discussing about the unknown inputs into any kind of a reliable calculation about the emissions impacts of this gas. But paragraph 80 of the original order? Paragraph 80 of the original order, 45 of the rehearing. But let me take a quick look at 45. But 80 doesn't say, look, it doesn't matter anyway, because the state's going to regulate it. It just says that we can't tell. Oh, no. Perhaps I misunderstood Judge Corman's question. I thought Judge Corman's question was with respect to the discussion of the unknowns. Did FERC make that argument? The alternative conclusion that FERC reached after saying we are not legally required to conduct this NEPA analysis of the end use, 100, 200 miles away consumption of this gas, because this isn't a connected action, because this is not an indirect effect caused by our approval of the reversal of this pipeline flow. Their alternative conclusion, Judge Corman, was the one that you discussed with Ms. Kafer, which is the notwithstanding paragraph. But I took your question to mean, did they also discuss the lack of foreseeability about where this gas goes, how it's mixed, and how it ends up? And that's what I was citing, too. Okay. There are no further questions. Thank you. Thank you very much. Rebuttal? You put six minutes on the clock. Our questions gave them a little extra time, so I'm going to give you a little extra time, too. Thank you, Your Honor. I appreciate that. I want to address about five points. And the first one is whether the amount is unknowable. And I would refer the court to two places in the record. One is volume four, tab 150, and the other is volume three, tab 151. Volume three, tab 115, page 6-211. And this is North Baja's statement. Therefore, at worst, no more than 1.2 billion BCDF per day of LNG source gas transported on the North Baja pipeline will enter the South Coast air basin. They have a number there. They say it could be lower. They give you a maximum. The second citation I would give the court is to North Baja's supplemental excerpts, tab 1, page 10, which is a listing of the contracts that the pipeline for the gas for the pipeline. And when the court looks at that, it will see a number of contracts totaling 2.7 million decatherms. And on the right, it will see the path where the various companies are in the pipeline. And the third one, 7 of the 809 say U.S.-Mexico border to SoCal gas. That gas is coming to Southern California. And Judge Hawkins, you're absolutely right. I would say follow the money. The consumers are in Southern California. Kennedy. Could I just ask you one question. I don't mean to interrupt you, but I actually do. I ask the question of your adversary in denying the petition, they say, notwithstanding the fact that we don't think we should consider it or we don't consider it, they say that the consumption of this gas transported by North Baja and meeting CPY's 1385 standard or less should not result in a material increase in air pollutant emissions, and therefore should not result in material changes in air quality in the basin. And I guess my question is, how do you explain that? My question is, suppose an agency prepares a NEPA statement and it makes a factual, makes a determination that there won't be an adverse effect, and somebody comes along and says, well, you're wrong. What happens? Does that affect the validity of the environmental impact statement? Your Honor, if there's a dispute among experts, certainly it doesn't. But that isn't the case here. I want to make sure the Court understands that. In two points, this actually was the next thing I was going to raise. At Volume 1, tab 168, page 10, this is what the Commission's order says. The Commission does not dispute the consumption of regasified LNG with a relatively higher Willoughby index can have air quality impacts. And then it turns around and it makes the finding. But it says it's not going to result in material changes in air quality in the basin. Now, all I want to know is, if they're wrong, even if they're wrong, and you could prove that they're wrong, does that affect the validity of the environmental impact statement? It does when the information that supposedly supports the finding isn't in the environmental impact statement. And there's no question that that's true here. FERC's position was, we're not going to analyze those impacts. Sure, it reached the conclusion, but the EIS doesn't support it, and there's no substantial evidence. The term hard look is used in the NEPA cases. This is the antithesis of a hard look. This is, we'll make a finding and hope we can get away with it. Well, why doesn't the State remedy provide an adequate assurance? Let's assume that there is a, and I realize you dispute this, but let's assume you have a State that enforces the air quality regulation strictly, and as California's, there's a post-emission or post-burning remedy. Why isn't FERC entitled to rely on that in saying, we don't think the air quality is going to suffer? Number one, the emissions aren't necessary because the gas can be conditioned. But number two, the point is to avoid that. Why should the air quality be conditioned? Because if it's conditioned, it's going to deteriorate. And then we have to deal with it on an after-effect basis. And, of course, it's my client that's going to have to deal with the emissions from that. It's not the CPUC and it's not FERC. If the CPCU had, in their hearings, had concluded that the maximum would be 1332, would we be here? No, Your Honor. No, because if it were 1332, the historical average, there wouldn't be any increase in emissions. And we would go home happy. You wouldn't be here if it was 1360. What we said was that we could live for the interim period until there was more information done. That was a temporary remedy. It was not a permanent remedy. And I want to address the CPUC. I just want to quote them. Is this an accurate quote? They say you argued that introducing the effects of introducing higher WI gas are uncertain, and therefore that the 2% ban would preserve the status quo while additional research and studies are performed. So your number is essentially as arbitrary as the 4%. Because the truth is, you don't know. And you say, well, let's preserve the status quo. Your Honor, we looked at the evidence. I would say just the opposite. We looked at the evidence, consulted the experts, and came up with a figure that we thought we could live with in the interim and put that forward. That number was rejected. So we certainly didn't put it forward as a, you know, this, the liquid natural gas is intended to permanently replace, in the long run, the two sources. In the Permian Basin and the San Juan Basin, which are declining. In the long run, all that gas is going to flood into Southern California because there's going to be no other source. Could I ask you just one general question out of curiosity? From everything that I read, it seems to me that this is all going to become moot at some point because of huge discoveries of additional domestic natural gas. That we're basically, I don't know what you do, do you roll the natural gas? I mean, there are so many such huge discoveries of natural gas domestically that this, how significant is this? I know it has nothing to do with the legal issues. It's just curious. Is this dispute here in a larger context? Your Honor, I'd have to beg off. I simply don't have enough knowledge about the future reserves of gas to answer your question. I don't want to speculate. I apologize. Do we have any authority to tell the Public Utility Commission in California where they should set this index? No, Your Honor. You only have authority over FERC. But I do, before I lose the rest of my time, if I can answer your question. But FERC accepted what the CPUC did, right? They put the condition on the pipeline, that's correct. But they relied on the CPUC as saying the CPUC analyzed the impacts. And I wanted to give the Court one more cite, if I might. Sure. And that's to Volume 6, Tab A, page 169. When you look at what the CPUC said, they said, we don't have to analyze the air quality impacts because, quote, there's no causal link between the narrowing of the parameters of the gas quality rules and the alleged impact to air quality. And then they said several pages later, in a footnote, it's FERC that ought to do it. So the FERC can't rely on the CPUC because the CPUC says FERC ought to do it. The bottom line is, neither of them have done it. And our point is, before this kind of adverse environmental impact is put into effect, NEPA requires that kind of analysis. And with that, we'll submit, unless the Court has any questions. Thank you. Thank you, everyone, for their arguments. A very interesting case. It's now submitted for decision, and the Court will stand in recess for the day.
judges: Korman, Hawkins, Thomas